**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:   THE HONORABLE CLAIRE R. KELLY, JUDGE**
-------------------------------------------------------------------- X

| | |
|---|---|
| **MAPLE LEAF MARKETING, INC.** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| *v.* | : |
| | : |
| **THE UNITED STATES, JOSEPH R. BIDEN,** | : |
| **IN HIS OFFICIAL CAPACITY AS PRESIDENT OF** | : |
| **THE UNITED STATES; GINA M. RAIMONDO., IN** | : |
| **HER OFFICIAL CAPACITY AS SECRETARY, U.S.** | : |
| **DEPARTMENT OF COMMERCE; CHRIS** | : |
| **MAGNUS, IN HIS OFFICIAL CAPACITY AS** | : |
| **ACTING COMMISSIONER, U.S. CUSTOMS AND** | : |
| **BORDER PROTECTION; KATHERINE C. TAI, IN** | : |
| **HER OFFICIAL CAPACITY AS U.S. TRADE** | : |
| **REPRESENTATIVE,** | : |
| | : |
| **Defendants.** | : |

**Case No. 20-00125**

-------------------------------------------------------------------- X

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Neville Peterson LLP
*Counsel for Maple Leaf Marketing, Inc.*

Richard F. O'Neill
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

John M. Peterson
Patrick B. Klein
55 Broadway, Ste. 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com
pklein@npwny.com

Dated: March 18, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56 MOTION FOR JUDGMENT
ON THE AGENCY RECORD ...................................................................................1

STATEMENT PURSUANT TO RULE 56.1 .............................................................2

I.      Issue Presented for Review. ..........................................................................2

II.     Administrative Determinations to be Reviewed. ..........................................2

BACKGROUND ........................................................................................................3

I.      Oil Country Tubular Goods and J-55 Steel Tubing, Generally. ...................3

II.     Maple Leaf Marketing, Inc., Endurance Technologies Inc., and EndurAlloy Tubing. .......5

III.    March 2018 Imposition of Section 232 Duties and Exclusion Request Process. .............11

        A.      MLM Files Section 232 Exclusion Requests with BIS. .......................14

        B.      Maverick Files Objections to MLM's Exclusion Requests, Making False
                Claims About its Product Offerings and Production Capabilities, and
                Mischaracterizing EndurAlloy as a "Standard Product." .....................16

        C.      MLM Rebuts Maverick's Objection Claims..........................................19

        D.      Maverick Declines to Respond to MLM's Rebuttal Letter and Supporting
                Exhibits. ..............................................................................................21

        E.      BIS Distinguishes Between Methods of Production in Determining MLM's
                Seamless and ERW Tubing Exclusion Requests, Granting Exclusions for
                Seamless J-55 Tubing But Denying Exclusions for ERW J-55 Tubing Despite
                There Being No Difference Imparted on the EndurAlloy End-Product By Virtue
                of the J-55 Tubing's Status as ERW or Seamless...................................22

        F.      MLM Files Action Alleging *Inter Alia* that the Denial Decisions Must Be "Set
                Aside" as Unlawful Under the APA. .....................................................22

        G.      The Court Grants the Government's Consent Motion Ordering Voluntary
                Remand of Count II of Plaintiff's Complaint to BIS For Reconsideration of
                Denial Decisions. .................................................................................23

        H.      On Remand, the Department Upholds its Original Denial Determinations..........23

ANALYSIS..................................................................................................................24

I.      Standard of Review......................................................................................24

II.     This Action Must be Remanded With Instructions for BIS to Supplement the Record
        With Information Regarding *Ex Parte* Communications Relied Upon by the Agency in
        Making its Denial Determinations. ...........................................................26

        A.      Remand is Required to *Inter Alia* Identify the SME, Evaluate His or Her
                Qualifications, and Identify What Facts Were Reviewed.....................29

III.    There is No Justifiable Rationale For Denying Plaintiff's Exclusion Requests. ...............35

    A.    Maverick's Objection Filing Includes Clearly Contradictory Claims That are Irreconcilable and Cannot be Resolved on Remand. ..............................................35

        1.    Maverick Falsely Claimed it Can Manufacture a Product *Identical* to EndurAlloy Within 8 Weeks and Merely Copied the Metallurgical Profile of EndurAlloy in its Objection. ......................................................35

        2.    The Department Erroneously Evaluated Maverick's Objection as if the Objector Had Claimed Substitutability as a Basis for its Objection. .........37

        3.    On the Basis of Maverick's Contradictory and Factually Impossible Claims, The Department's Denial Decisions Cannot be Sustained. ..........39

    B.    The Department Contradictorily Concluded that EndurAlloy Processed from Seamless Tubing is Not Sufficiently Available in the United States While EndurAlloy Processed from ERW Tubing is Not. ..................................................40

    C.    The SME Erroneously Concluded that MLM's "Claim that the Requested Specifications Can Only Be Met Using the Boron Surface Hardening Methods Employed by its Current Manufacturer is Incorrect" Was Itself Incorrect, as Was the SME's Conclusion that "Based on Technical Factors, the Objection Offering is Deemed a Suitable Substitute." .........................................................42

CONCLUSION .....................................................................................................................43

**TABLE OF AUTHORITIES**

**Cases**

*Alabama Aircraft Indus., Inc. v. United States*, 586 F.3d 1372 (Fed. Cir. 2009) ........................ 25

*Bethlehem Steel Corp. v. Environmental Protection Agency*, 638 F.2d 994 (7th Cir. 1980) ....... 31

*Borusan-Mannesman Steel Pipe Co. v. United States*, No. 20-00012, 2020 Ct. Intl. Trade
LEXIS 95 (Ct. Int'l Trade June 25, 2020) ................................................................................ 34

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ................................................. 25

*Goldenberg v. Fed. Bureau of Prisons*, 2021 U.S. App. LEXIS 24266 (Fed. Cir. 2021) ............ 32

*Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977) ..................................................... 32

*In re Sang Su Lee*, 277 F.3d 1338 (Fed. Cir. 2002) ................................................................... 25

*JSW Steel Inc. v. Nucor Corp*., 2022 U.S. Dist LEXIS 28648 (S.D. Tex., February 17,
2022) ....................................................................................................................................... 19

*JSW Steel, Inc. v. United States*, 466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020) .................... passim

*Judulang v. Holder*, 565 U.S. 42 (2011) .................................................................................... 25

*Motor Vehicle Mfrs. Ass'n of US., Inc. v. State Farm Mut. Auto. Ins*. Co., 463 U.S. 29
(1983) ...................................................................................................................................... 25

*NLMK Pa., LLC v. United States*, No. 21-00507, 2022 Ct. Intl. Trade LEXIS 6 (Ct. Int'l
Trade Feb. 1, 2022) ...................................................................................................... 23, 26, 34

*Norca Indus. Co., LLC v. United States,* 2022 Ct. Intl. Trade LEXIS 18 (Ct. Int'l Tr.
March 11, 2022) ...................................................................................................................... 33

*PATCO v. FLRA I*, 672 F.2d 109 (D.C. Cir. 1983) ..................................................................... 31

*Portland Audobon Soc. V. Endangered Species Comm.*, 984 F.2d 1534 (9th Cir. 1993) ........ 31, 32

*Prof. Air Traffic Controllers Ass'n. v. FLRA*, 685 F.2d 547 (D.C. Cir 1982) .......................... 32

*Salem Hosp. Corp. v. NLRB*, 808 F.3d 59 (D.C. Cir. 2015) ...................................................... 32

*Sangamon Valley Television Corp. v. United States*, *supra*, 269 F.2d 221 (D.C. Cir. 1959) ....... 33

*SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) ............................................... 23

*Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999) ........................................................................ 32

*Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021) .................................. 11

*United States Lines v. FMC,* 584 F.2d 519 (D.C. Cir. 1978) ..................................................... 32

**Statutes**

18 U.S.C. § 1001 ............................................................................................................. 16, 19, 21

19 U.S.C. § 1862 ............................................................................................................. 1, 2, 11, 15

28 U.S.C. § 1581 ...................................................................................................................... 24

28 U.S.C. § 2640 .................................................................................................................. 24, 29

5 U.S.C. §§ 701-06 .............................................................................................................. passim

**Regulations**

15 C.F.R. Part 705 .................................................................................................................... 15

**Other Authorities**

3 Charles H. Koch, Jr., Administrative Law and Practice § 8:31(d) (3d ed. 2010) ..................... 23

Office of Inspector General, U.S. Dep't Commerce: *Management Alert: Certain
Communications by Department Officials Suggest Improper Influence in the Section
232 Exclusion Request Review Process* (October 28, 2019) .................................................... 33

Proclamation 9705 (March 8, 2018), *Adjusting Imports of Steel into the United States*, 83
Fed. Reg. 11,625 (March 15, 2018) ................................................................................... 11, 12

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:    THE HONORABLE CLAIRE R. KELLY, JUDGE
------------------------------------------------------------------ X
MAPLE LEAF MARKETING, INC.                          :
                                                    :
          Plaintiff,                                :
                                                    :
     v.                                             :
                                                    :
THE UNITED STATES, JOSEPH R. BIDEN,                 :
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF            :
THE UNITED STATES; GINA M. RAIMONDO., IN            :       Case No. 20-00125
HER OFFICIAL CAPACITY AS SECRETARY, U.S.            :
DEPARTMENT OF COMMERCE; CHRIS                       :
MAGNUS, IN HIS OFFICIAL CAPACITY AS                 :
ACTING COMMISSIONER, U.S. CUSTOMS AND               :
BORDER PROTECTION; KATHERINE C. TAI, IN             :
HER OFFICIAL CAPACITY AS U.S. TRADE                 :
REPRESENTATIVE,                                     :
                                                    :
          Defendants.                               :
------------------------------------------------------------------ X

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Plaintiff, Maple Leaf Marketing, Inc. ("MLM"), by and through undersigned counsel, hereby moves this Court pursuant to Rule 56 of the Rules of the U.S. Court of International Trade ("USCIT R.") for judgment on the agency record with respect to Count II of Plaintiff's Complaint (ECF 5). Count II challenges the final determination of the U.S. Department of Commerce (the "Department" or "Commerce"), though its constituent, the Bureau of Industry and Security ("BIS"), denying Plaintiff's requests for exclusion of certain unique steel tubing products from additional tariffs imposed pursuant to Section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862 ("Section 232"). BIS recently upheld its denial following a voluntary remand from this Court. *See* Consent Motion to Remand Count II (July 20, 2021) (ECF 33); Order Granting Consent Motion to Remand (July 20, 2021) (ECF 34); Remand Results filed by Commerce (October 18, 2021) (ECF 38). As noted herein, the Department's original and remand

1

denials of Plaintiff's two exclusion requests are arbitrary and capricious and an abuse of discretion in contravention of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06.

Plaintiff respectfully requests that the Court set aside as unlawful the Department's denial of Plaintiff's exclusion requests and remand the matter to Commerce with instructions to supplement the agency record.

## STATEMENT PURSUANT TO RULE 56.1

### I.     Issue Presented for Review.

Count II of Plaintiff's Complaint contends that the decisions of the Department denying Plaintiff's requests for exclusion from the Section 232 tariffs, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A), due to the Department's failure to *inter alia* (i) correctly consider and accept record evidence; (ii) follow its own rules and regulations concerning exclusion requests; (iii) explain in its denial decisions a reasonable basis for its conclusion based on citations to record evidence; (iv) explain in its denial decisions a reasonable basis for believing and relying on the representations of the objector, Maverick Pipe and Tube ("Maverick" or the "Objector"), when Maverick itself declined to further support or defend its claims in a surrebuttal filing after MLM's filing of a strong and pointed rebuttal letter and supporting exhibits; and (v) decide the exclusion requests on the basis of record evidence, as opposed to the self-contradictory claims of an Objector.

### II.    Administrative Determinations to be Reviewed.

Plaintiff challenges decisions by the Department denying its requests for exclusion from the Section 232 tariffs. Specifically, Plaintiff challenges two (2) denial determinations concerning exclusion request nos. 11927 and 11928, both of which were field with BIS on August 2, 2019 and

posted publicly on BIS' website on August 14, 2019. The exclusion requests were denied based on BIS' determination that comparable product was available from the Objector, Maverick.

The products covered by the exclusion requests are unique, consisting of certain specified diameters of the following:

> API 5 CT Range 2 (*i.e.,* 28 to 32 feet) hardened (thermos-chemical diffusing boron alloying procedure on ID of tubing) tubing which extends the service life of joints and couplings of oil field tubing and promotes resistance to many corrosive gases and liquids (*e.g.,* acids, alkalis, high temperature, high pressure water steam with high contents of salts, H2s, CO, CO2, hydracarbons, etc.). No other product performs as well as EndurAlloy in these conditions.

*See* MLM Exclusion Request Form, ERID 11927-016; 11928-016.

On July 20, 2021, the Government filed a motion to remand Count II of MLM's Complaint so that the Department could "reconsider the 2 exclusion requests at issue, and to provide additional explanation for its decisions." *See* Def.'s Consent Mot. Voluntary Remand (ECF 33), at 2. On October 18, 2021, the Government filed a letter (ECF 38) styled as "Final Results on Court remand Order in *Maple Leaf Marketing, Inc. v. United States*, Court No. 20-00125." The filing included the remand results, which sustained BIS' original denial determinations with little additional details revealed, and in a manner that created significant additional legal issues caused by the inherently arbitrary and capricious nature of the exclusion review proceedings.

This Motion seeks judgment on the agency record concerning Count II of Plaintiff's Complaint, which challenges as unlawful the Department's denial decisions.

## BACKGROUND

I.    **Oil Country Tubular Goods and J-55 Steel Tubing, Generally.**

The term *oil country tubular goods* ("OCTG") refers to pipes and tubes used in the extraction of oil and gas from the earth. There are three main types of OCTG pipes: (i) casing pipes (used to stabilize a wellbore); (ii) tubing pipes (tubular goods through which oil/gas is transported

3

to the surface from the wellbore); and (iii) drill pipes (heavyweight seamless tubular goods that rotate the drill bit and circulate the drilling fluid). The EndurAlloy products at issue are tubing pipes.

Tubing pipes which bring oil and gas from underground up to the field for further processing are subject to significant mechanical stressors and very high loads during the extraction operations, which can result in damage to the pipes. In addition, tubing pipes' diameters must support the expected oil and gas flow from the ground to the surface, and the internal diameter of the tubing must remain consistent.

The American Petroleum Institute ("API") is a standards-setting organization that convenes subject matter experts across industry segments to establish, maintain, and distribute consensus standards for the oil and gas industry. API standards are developed under API's American National Standards Institute ("ANSI") accredited process, which facilitates acceptance by state, federal, and international regulators, enhances the safety of industry operations, assures quality, reduces costs and waste, and minimizes confusion.

API publishes its standards in the *API Specification 5CT, Specification for Casing and Tubing*, 9th Edition, June 2011 (hereinafter "API 5CT"). The API 5CT standards conform with those published by International Standards Organization ("ISO") 11960:2011 Petroleum and Natural Gas Industries, applicable to steel pipes for use as casing or tubing for wells. Of relevance here are the API 5CT standards applicable for J-55 steel tubing, which is the API specification for Plaintiff's product that was exported from the United States, improved in condition abroad in Canada through a thermo-chemical diffusion boron alloying procedure on the inner diameter ("ID") of the J-55 tubing, and then re-entered into the United States under subheading 9802.00.50, HTSUS.

4

API steel tubing is identified by letters and numbers which dictate various characteristics of the steel. For each grade, the number designates the minimum yield strength. For example, "J-55" grade steel has a minimum yield strength of 55,000 psi, and can support a stress of 55,000 psi with an elongation of less than 0.5%. The letter in conjunction with the number then conveys important parameters such as the maximum yield strength and the minimum ultimate strength of the article, which for J-55 steel tubing are 80,000 psi and 75,000 psi.

J-55 tubing is a relatively small-diameter OCTG that serves as a conduit for the passage of oil and gas to the oilfield surface for processing. API steel tubing is identified by the tubing's most essential characteristics: the grade, outer diameter, weight, range (*i.e.,* length), and connection (*e.g.,* external upset end ("EUE"), non-upset end ("NUE"), long thread coupled ("LTC")); these characteristics convey vital information for the safe, compatible, reliable, and efficient performance of tubing strings in oilfield operations.

Tubing must be adequately strong to resist loads and deformations associated with production and workovers. Further, tubing must be sized to support the expected rates of production of oil and gas. This explains why the EndurAlloy tubing re-entered into the United States by MLM following ETI's Canadian boronization operations must always retain the essential characteristics of the J-55 tubing that was previously exported—otherwise, it would not conform to the specifications required in oil and gas production settings.

## II.    Maple Leaf Marketing, Inc., Endurance Technologies Inc., and EndurAlloy Tubing.

At all times relevant to this action, Plaintiff, Maple Leaf Marketing Inc., a Midland, Texas, corporation, acted as the exclusive U.S. importer and distributor[1] of "EndurAlloy" Tubing.

---

[1] MLM was, at all times relevant to this action, the exclusive U.S. importer and distributor of "EndurAlloy" Tubing with the exception of such rights in the State of Alaska.

EndurAlloy is the trademarked name for a steel tubing product which has been altered by Endurance Technologies Inc. ("ETI"), in Alberta, Canada, through a process described below which deposits a microns-thin layer of boron into the inner diameter of the J-55 tubing's steel substrate; this thin layer of boron provides enhanced hardness anti-corrosive characteristics to the inner diameter of J-55 tubing without affecting the tubing's internal diameter and API characteristics. *See e.g.,* Exclusion Request Nos. 11927 and 11928 (June 26, 2019) ("MLM Exclusion Request"), ERID 11927-021; 11928-021.

At the times relevant to this action, ETI was the only North American company capable of performing a thermo-chemical diffusion boron alloying procedure on the ID of Range 2 (28 to 32 foot lengths) API 5CT J-55 steel tubing. *See* MLM Exclusion Request, ERID 11927-016; 11928-016; MLM Rebuttal Letter of October 1, 2019 ("MLM Rebuttal"), ERID 11927-044; 11928-044. This is because such an alteration procedure requires specialized and very large facilities and deposition chambers capable of encasing, vacuum sealing, and after exposure to extremely high heat, chemically depositing alloying elements of boron into the inner diameter of ordinary J-55 tubing. MLM Rebuttal, ERID 11927-043; 11928-043.

To manufacture EndurAlloy, ETI sources Range 2 (28' – 32') API Spec. 5CT J 55 steel tubing with API EUE from its list of pre-approved U.S. vendors. MLM Exclusion Request, ERID 11927-022; 11928-022. The tubing is shipped to ETI's facility in Calgary, Alberta, Canada. In Calgary, ETI processes the tubing into EndurAlloy by loading a proprietary[2] "chemical pack" into the inner diameter of ordinary J-55 steel tubing substrate. ERID 11927-022 – 023: 11928-022 – 023. Then, under very high temperatures, the boron and other chemicals are

---

[2] ETI has devised a unique and proprietary cocktail of chemical powders which it mixes together in a "chemical pack" to form, after ETI's thermal-diffusion processing is complete, a protective layer on the ID of the tubing. ERID 11927-023, at n.4; 11928-023, at n.4.

thermally-deposited within the J-55 tube such that a microns-thin alloyed surface structure of boron forms on the inner diameter of the J-55 carbon steel tubing. *Id.*

This is known as a surface engineering thermo-chemical diffusion (*i.e.,* thermal-diffusion) process based on the chemical vapor deposition ("CVD") principles. *Id.* During the process, boron atoms, being in the gas phase, deposit and diffuse into the heated steel surface with consequent formation of iron borides with their growth and consolidation yielding a hard and chemically inert protective layer. *Id.* This process is sometimes referred to as "diffusion alloying" and/or "pack cementation process." *Id.*

The boron surface structure is comprised of two iron boride phases: FeB ( one atom of boron and one atom of iron); and Fe2B (one atom of boron and two atoms of iron). *Id.* These two phases combine to create the total surface modification on the inner diameter of steel tubing substrate. *Id.* A new protective layer is formed on EndurAlloy products through the combined thermo-chemical reactions, diffusion, and high-temperature consolidation processes, and this diffusion-related bonding provides complete adhesion of the iron boride layers to the substrate with no delamination or peeling-off resulting in exceptional performance. *Id.*

By diffusing the alloyed surface structure of boron *into*—*i.e.,* in a manner that penetrates— the inner diameter of the J-55 carbon steel tubing, the anti-corrosive alloying elements do not affect the inner diameter of the J-55 steel tubing. MLM Rebuttal, ERID 11927-046; 11928-046. Were this not the case, the end-product, EndurAlloy, would not meet the API requirements and could not be used interchangeably with other non-EndurAlloy J-55 steel tubing—as is required in OCTG operations. *Id.*

The boronizing process substantially increases the Knoop hardness of the inner surface of the tubing and makes it far superior to J-55 tubing when used in challenging oil and gas drilling

7

environments. MLM Exclusion Request, ERID 11927-023; 11928-023. In this way, EndurAlloy substantially increases the efficiency and productivity of oil and gas exploration operations and extends the service life cycle of tubing strings in oil and gas wells. *Id.*

EndurAlloy products have a unique chemical composition that can only be verified by performing destructive testing recorded in a chemical analysis report. MLM Rebuttal, ERID 11927-046; 11928-046. EndurAlloy has been subject to destructive testing by a reputable scientific testing laboratory, Acuren Edmonton, whose results are proprietary but were offered by MLM to the Department upon request. *Id.* at ERID 11927-046 – 047; 11928-046 – 047. Such testing revealed that the original J-55 steel substrate's boron content increased from a pre-ETI-alteration amount of less than 0.005% to a post-ETI-alteration  level of boron in the amount of 0.097 – 0.102%. Aside from the impactful increase of alloying boron content, the pre- and post-production test results are nearly identical. *Id.* at ERID 11927-047; 11928-047.

The anti-corrosion properties of EndurAlloy are imparted through the proprietary EndurAlloy process. *Id.* at ERID 11927-044; 11928-044. This surface engineering treatment that does not mix boron throughout the steel substrate, but rather diffuses concentrated boron content into the first 0.008 – 0.010 of an inch of the inner diameter of the tubing. *Id.* The boron diffuses

into the upper crust of the steel substrate, forming a "saw-tooth" like surface structure of iron boride, similar to the depiction below:



**Boronized steel**

*Id.* at ERID 11927-044-045; 11928-044-045. The image displays an iron boride structure with notably few imperfections on its upper surface, which appears smooth and relatively constant in the above image (magnified 200 times). *Id.* at ERID 11927-045; 119284-045. There are also no noticeable flaws in the mechanical interfaces between the iron boride "teeth" and the steel substrate. *Id.* This clean adherence between the iron boride layer and steel substrate will promote the corrosion resistant properties imparted by the boron while lengthening the life cycle of the J-55 steel substrate. *Id.*

After processing, the J-55 tubes are inspected for compliance to API J-55 criteria. *Id.* at ERID 11927-046; 1928-046. ETI adheres to the API specifications and regulations for inspection of production tubing for yield and tensile strength, product chemistry, threading, tube length drifting, and many more exacting requirements. ETI is an International Organization for Standardization ("ISO") 9001 – 2015 company, meaning documentation, training, inspections and more are governed by API, which requires that ETI document and carry out all training inspections

9

to ensure compliance with inspection and other standards including API. *See* MLM Exclusion Request, ERID 11927-022; 11928-022.

ETI completes its processing by painting the exterior of the J-55 tubes gray so that they can be immediately distinguishable from ordinary J-55 steel tubing; absent this exterior paint, the EndurAlloy tubing would appear identical to standard J-55 tubes in the field, and a person could mistake the more expensive EndurAlloy for ordinary J-55 product, or vice versa, and the exactitude required in assembling J-55 tubing into an operable OCTG production facility could be frustrated. *See* MLM Exclusion Request, ERID11927-018; 11928-018.

A case study comparing the performance of EndurAlloy to regular J-55 steel tubing, in addition to coated OCTG, was provided to BIS. *See* MLM Rebuttal, ERID 11927-045; 11928-045; ERID 11927-049 – 056; 11928-049 – 056. Additionally, testing results from a third-party laboratory tasked with testing the abrasion resistance of EndurAlloy as compared to regular J-55 steel tubing was provided to BIS. *See Id.* at ERID 11927-045; 11928-045; ERID 11927-057 – 063; 11928-057 – 063. As indicated in these studies, EndurAlloy increases run time of OCTG operations, decreases downtime, and lasts three to ten times longer than regular J-55 tubing. In even the most severely corrosive high pressure- high temperature water steam with salts, CO and $CO_2$, $H_2S$, acidic gases and water injection environments, EndurAlloy tubing products stand up and perform to keep production moving forward. *Id.* at ERID 11927-045; 11928-045.

Moreover, despite the many different kinds of *coated* OCTG—including *e.g.,* cobalt coatings, BHA coatings, plastic coatings, vinyl coatings, and various types of spray, brush or bath application coatings, only some of which are applied to impart anti-corrosive characteristics on the tubing—but none are comparable to anti-corrosive characteristics of boronized EndurAlloy. MLM Rebuttal, ERID 11927-045 – 046; 11928-045 – 46. Additionally, a coated tubing product would

not retain the internal diameter of the original J-55 substrate to which the coating was applied. *Id.* at ERID 11927-046; 11928-046. This differs from EndurAlloy tubing, which retains dimensional and mechanical properties akin to the original J-55 steel tubing substrate, save for the increased hardness on the boronized inner surface. *Id.* While the interior diameter of EndurAlloy tubing is four times harder than a standard joint of API tubing—making it much more resistant to abrasion and corrosion—there is no loss of inside diameter as with many "conventionally" coated tubing products despite the formation of the protective iron boride layer that imparts a surface hardness of Knoop 1,800. *Id.* In this respect, EndurAlloy tubing has an ID that will meet API specifications (unlike coatings or linings). *Id.*

And to be clear, the industry recognizes these key differences. EndurAlloy is a far superior product to standard welded OCTG as is made clear by a price comparison of the products. EndurAlloy costs roughly four times more than standard welded OCTG. *Id.*

### III.   March 2018 Imposition of Section 232 Duties and Exclusion Request Process.

Section 232 authorizes the President to adjust imports of imported articles if substantive and procedural requirements of the statute are satisfied, and only where identified imports of those articles are investigated and determined to pose a threat to the national security of the United States. 19 U.S.C. § 1862(b)(1)(A); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1312 (Fed. Cir. 2021), *petition for cert. filed,* No. 21-721 (Nov. 16, 2021).

On March 8, 2018, former President Trump announced a 25 percent tariff on imports of certain steel articles, effective March 23, 2018. *See* Proclamation 9705 (March 8, 2018), *Adjusting Imports of Steel into the United States*, cl. 1-2, 83 Fed. Reg. 11,625 (March 15, 2018). Proclamation 9705 identified certain tariff provisions that would be subject to Section 232 duties, *id.* at cl. 1, but to implement the tariffs, subchapter III of Chapter 99 of the Harmonized Tariff Schedule of the

United States ("HTSUS") was modified to add subheading 9903.80.01, which would be used to classify and assess an additional 25 percent tariff on "all entries of iron or steel products" identified in Proclamation 9705. *Id.*, Annex (U.S. Note 16(a)).

Proclamation 9705 also authorized the Secretary of Commerce to exclude from the Section 232 duties "any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality" and further authorized the Secretary "to provide such relief based upon specific national security considerations." *Id.*, cl. 3.

A concise summary of the Commerce regulations governing the Section 232 product exclusion process was recently articulated in *JSW Steel, Inc. v. United States*, 466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020), which explained:

> On March 19, 2018, Commerce published an interim final rule that set forth the product exclusion process. *See Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12,106 (Dep't Commerce Mar. 19, 2018). Subsequently, based on comments and Commerce's experience administering the first interim final rule, Commerce issued a second interim final rule on September 11, 2018 that modified the first interim final rule. *See Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum,* 83 Fed. Reg. 46,026 (Dep't Commerce Sept. 11, 2018) ("September Rule"). Taken together, the rules, now codified at 15 C.F.R. Pt. 705, Supp. 1 (2019), identify who may request an exclusion ("requestor") and who may object to a request for an exclusion ("objector"); set forth the formalities and required information in requests and objections as well as for rebuttals and surrebuttals; define the criteria by which Commerce—and its subagencies, the BIS and the International Trade Administration ("ITA")—evaluates a request for an exclusion; and, establish timelines for the exclusion request process.
>
> Directly affected individuals or organizations using steel in business activities located in the United States may submit exclusion requests. 15 C.F.R. Pt. 705, Supp. 1 at ¶ (c)(1). Requestors must complete and submit an electronic form, which requires certain factual information. *Id.* at ¶¶ (b)(1), (c)(3). The submission must include the requestor's name, the date, and the 10-digit Harmonized Tariff Schedule of the United States ("HTSUS") statistical reporting number for the requested steel

article to be excluded. *Id*. at ¶ (c)(2).4 In addition, the regulations require a requestor to "clearly identify" and "provide support" for which of the three enumerated criteria the requestor bases its request. *Id*. at ¶ (c)(5). Individuals or organizations that manufacture steel in the United States may object to an exclusion request by, likewise, submitting an electronic form that identifies the objector and the relevant exclusion request. *Id*. at ¶ (d). The objector must also identify and provide support as to why Commerce should reject the request based on the three criteria. *Id*. at ¶¶ (c)(5), (d)(4). A requestor may rebut any objections, and objectors may submit surrebuttals. Commerce denies incomplete exclusion requests and declines to consider any incomplete objections, rebuttals, and surrebuttals. *Id*. at ¶ (h)(1).

Commerce reviews complete exclusion requests to determine whether the article described in the request meet any of three criteria, namely "the article is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for specific national security concerns." *Id*. at ¶¶ (c)(6), (h)(2). The regulations define the criterion "not produced in the United States in a sufficient and reasonably available amount" to mean that the amount of steel needed by the requestor is not available "immediately" to meet its business needs. *Id*. at ¶ (c)(6)(i). By "immediately," the regulations elaborate that the product is currently produced or could be produced within eight weeks in the amount needed described in the exclusion request. *Id*. The criterion "not produced in the United States in a satisfactory quality" requires the steel to be equivalent as a "substitute product," as in steel produced by an objector that can "immediately" meet "the quality (*e.g.*, industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S. produced steel to be used in that business activity in the United States by that end user." *Id*. at ¶ (c)(6)(ii). Finally, the criterion "for specific national security considerations" enables Commerce, in consultation with other parts of the government, as warranted, to determine whether denying an exclusion request would have an impact on national security. *Id*. at ¶ (c)(6)(iii).

Commerce "normally" will issue its response to an exclusion request as a memorandum that is "responsive to any of the objection(s), rebuttal(s) and surrebuttal(s)" within 106 days of the exclusion request submission. *Id*. at ¶¶ (h)(2)(i)(B), (h)(3)(i). Granted exclusion requests are generally approved for one year on a product basis and are usually limited to the requestor, unless Commerce authorizes the exclusion to apply to additional importers. *Id*. at ¶¶ (c)(2), (h)(2)(iv). If an exclusion request is denied based on a representation made by an objector with respect to the availability of the requested steel or of a substitute in the United States, and it later comes to light that the representation is inaccurate, a requestor may submit a new exclusion request that refers back to the original denied request. *Id*. at ¶ (c)(6)(i)-(ii).

13

*JSW Steel,* 466 F. Supp. 3d at 1324-25 (footnotes omitted) (emphasis in original). The Court also noted that "[t]he Department identifies BIS as 'the lead agency' in deciding whether to grant exclusion requests and the ITA as 'analyzing requests and objections to evaluate whether there is domestic production available to meet the requestor's product needs[.]'" *Id.* at 1324, n3 (citing September Rule, 83 Fed. Reg. at 46,027, 46,032).

### A.  MLM Files Section 232 Exclusion Requests with BIS.

Plaintiff refiled[3] five (5) exclusion requests with BIS pursuant to the Interim Final Rule, as follows:

| BIS Request ID No. | HTSUS | Product Information |
|---|---|---|
| 11918 | 7304.29.61.15 | EndurAlloy Tubing: *seamless*, range 2 (*i.e.,* 28'-32') API Spec. 5CT J-55 Tubing; diameter 72mm – 74mm; inner diameter of tubing boronized by thermo-chemical diffusion boron alloying procedure on ID of tubing; API external-upset-end ("EUE") tubing connections).. |
| 11924 | 7304.29.61.15 | EndurAlloy Tubing: *seamless*, range 2 (*i.e.,* 28'-32') API Spec. 5CT J-55 Tubing; diameter 60mm – 61mm; inner diameter of tubing boronized by thermo-chemical diffusion boron alloying procedure on ID of tubing; API EUE tubing connections. |
| 11926 | 7304.29.61.15 | EndurAlloy Tubing: *seamless*, range 2 (*i.e.,* 28'-32') API Spec. 5CT J-55 Tubing; diameter 88mm – 90mm; inner diameter of tubing boronized by thermo-chemical diffusion boron alloying procedure on ID of tubing; API EUE tubing connections. |
| 11927 | 7306.29.81.10 | EndurAlloy Tubing: *electric resistance welded* ("*ERW*"), range 2 (*i.e.,* 28'-32') API Spec. 5CT J-55 Tubing; diameter 88mm – 90mm; inner diameter of tubing boronized by thermo-chemical diffusion boron alloying procedure on ID of tubing; API EUE tubing connections. |

---

[3] MLM had previously filed exclusion requests with BIS in July 2018; those requests were denied without prejudice in December 2018 and MLM was invited to refile exclusion requests. *See e.g.,* BIS Decision Memorandum Nos. BIS-208-0006-23575 (Dec. 11, 2018); BIS 2018-0006-23580 (Dec.11, 2018); BIS 2018-0006-23574 (Dec. 11, 2018); BIS-20118-0006-23578 (Dec. 11, 2018); BIS-20118-0006-23579 (Dec. 11, 2018); BIS-20118-0006-23576 (Dec. 11, 2018); BIS-20118-0006-23573 (Dec. 11, 2018); BIS-20118-0006-23852 (Dec. 11, 2018), BIS-20118-0006-23855 (Dec. 11, 2018).

| 11928 | 7306.29.81.10 | EndurAlloy Tubing: *electric resistance welded* ("*ERW*"), range 2 (*i.e.,* 28'-32') API Spec. 5CT J-55 Tubing; diameter <u>60mm – 61mm</u>; inner diameter of tubing boronized by thermo-chemical diffusion boron alloying procedure on ID of tubing; API EUE tubing connections. |
|---|---|---|

*See e.g.,* Section 232 Exclusion Request ID Nos. 11928, 11927, 11926, 11924, 11918. These exclusion requests were posted on the Section 232 docket on August 14, 2019.

As shown in the above-table, the only differences in MLM's five (5) exclusion requests are (i) the associated tariff number, which corresponds to the EndurAlloy tubing's status as a "Seamless" or "Electric Resistance Welded" ("ERW") tube under subheading 7304 or 7306[4]; and (ii) the tubing's diameter (*i.e.,* 60-61mm, 72-74mm, or 88-90mm). Notably, <u>MLM's five (5) exclusion requestions were each addressed to a single type of product—*i.e.,* **EndurAlloy J-55 Tubing**</u>—but because EndurAlloy Tubing is available in varying diameters, separate exclusion requests were required for each unique diameter of EndurAlloy seeking exclusion. *See e.g.,* 15 C.F.R. Part 705, Supplement No. 1 (c)(2).[5]

---

[4] The HTSUS contains different classifications for "seamless" steel pipe and tube (Heading 7304) and for "ERW" pipe and tube (Heading 7306). The status of the tubing as seamless or ERW is immaterial to Plaintiff's customers, who purchase either type of boronized J-55 tube interchangeably and without inquiry into whether the product was altered from ERW or seamless.

[5] To be clear, MLM sought exclusions for only three (3) unique diameters of EndurAlloy Tubing (*i.e.,* 60-61mm, 72-74mm, or 88-90mm). The diameter of the tubing presents the only meaningful difference to MLM's end-use customers. One might expect that MLM would only have been required to file three (3) exclusion requests with BIS to cover the specific diameters of products seeking exclusion. However, due to peculiarities of the HTSUS and because MLM's Canadian supplier of EndurAlloy, ETI, sources both *seamless* tubing and *electric resistant welded* ("ERW") tubing from its vendors, the EndurAlloy imported into the United States following ETI's alterations are classified under two different tariff subheadings of Chapter 73: (i) *subheading 7304* whenever the underlying tubing comprising the EndurAlloy product is seamless; and (ii) *subheading 7306* whenever the underlying tubing is ERW. <u>It must then be reiterated that ERW and seamless EndurAlloy (of the same diameter) are wholly identical products.</u> MLM's customers do not inquire about the ERW or seamless status of the J-55 tubing because it is wholly inconsequential to the price and performance of EndurAlloy Tubing, and has no effect whatsoever on OCTG drilling and extraction operations.

**B.**     **Maverick Files Objections to MLM's Exclusion Requests, Making False Claims About its Product Offerings and Production Capabilities, and Mischaracterizing EndurAlloy as a "Standard Product."**

On September 25, 2019, Maverick Pipe and Tube ("Maverick") filed five (5) objections against each of Plaintiff's five (5) exclusion requests. *See* Maverick Objection (ECF 42-1), ERID 11927-036; 11928-036.

Maverick objected on a **single basis** in the objection form, claiming it can produce a product *identical* to EndurAlloy. ERID 11927-029; 11928-029. However, the BIS Objection Form repeatedly inquired whether Maverick was objecting on the basis that it does currently, or could within 8 weeks, manufacture a substitute product that is "similar" to EndurAlloy in form, fit, function, and performance; Maverick consistently answered "**No**" or "**N/A**," and certified[6] the following objection claims:

---

[6] The BIS Objection Form requires submission "by an organization official authorized to certify the document as being accurate and complete." ERID 11927-034; 11928-034. It continues:

> The undersigned certifies that the information herein supplied in response to this questionnaire is complete and correct to the best of his/her knowledge. It is a criminal offense to willfully make a false statement or representation to any department or agency of the United States Government as to any matter within its jurisdiction. [18 U.S.C. 1001 (1984 & SUPP. 1997)].

*Id.* (emphasis added). In its Rebuttal Letter, MLM noted that Maverick's certification under 18 U.S.C. § 1001 is questionable and troubling in light of the patently false assertions and contradictory positions contained therein.

> Is the product type identified in the Exclusion Request currently manufactured by your organization in the United States , or can it immediately be made (within 8 weeks) by your organization, in a company-owned plant in the United States?  If "Yes" identify the location(s) of your production facilities  in the United States.
>
> Yes
>
> Locations
>
> | City | State | Current Annual Plant Production Capacity (mt) | % Plant Utilization Current | |
> |------|-------|-------|-------|--|
> | Blytheville | Arkansas | | | |
>
> This organization does not currently manufacture the identified product, but can produce the product identified in the Exclusion Request within the following time period at the following facilities:
>
> Comments
>
> N/A. Maverick has capability to manufacture and supply the identified steel product. Capacity and utilization levels for our plants is business proprietary information and can be provided upon request.
>
> Does this organization currently manufacture, or can immediately manufacture (within 8 weeks), in a company-owned plant located in the United States a substitute product for the identified product that has similar form, fit, function, and  performance? If "Yes" identify the location(s) of your production facilities  in the United States, current plant capacity and utilization
>
> No
>
> This organization does not currently manufacture the identified product, but can make a substitute product that has similar form, fit, function, and performance within the following time period at the following facilities:
>
> Comments
>
> N/A. Maverick has capability to manufacture and supply the identified steel product. Capacity and utilization levels for our plants is business proprietary information and can be provided upon request.

*See* ERID 11927-029; 11928-029. Thus, Maverick repeatedly disclaimed in its Objection Form submission an ability to manufacture a substitute product with a similar form, fit, function and performance to EndurAlloy.

However, in Maverick's barely two (page) letter submitted with its Objection Form, Maverick presented misleading and contradictory statements about the basis for its objections. Maverick discusses substitutability of a "coated welded OCTG" in "the requested amount" and

claims it can produce such a product. ERID 11927-036; 11928-036. But given that Maverick explicitly disclaimed in its Objection Form the ability to produce a substitute product, it failed to identify the information BIS requires for a substitutability analysis—*i.e.,* the information that must be presented in the objection form (*e.g.,* coating type and composition, coating method, coating product name and abbreviation, coating composition, coating weight and thickness).

To be clear, the suggestion in Maverick's letter that a substitute product is available runs directly counter to the repeated claims made in its Objection Form, depicted above, wherein it repeatedly disclaimed substitutability. To add to the confusion, on the very next page of its letter, Maverick returns to its original position consistently asserted in its Objection Form, stating that:

> Maverick, in particular, has the capacity in the United States to produce **the requested products**, meeting the requirements cited in the exclusion request forms from both a qualitative and quantitative perspective.

*Id*. (emphasis added). Thus, in claiming the ability to produce "the requested product" at issue in MLM's requests—*i.e.,* EndurAlloy—Maverick returns to an "identical product" objection claim after merely suggesting a contradictory substitutability claim (but failing to "offer" any specific product as a comparison, which makes the SME's conclusions about "Maverick's offering" impossible to sustain).

Maverick's objections contain additional significant misrepresentations. To reiterate, Maverick claimed, without any support, that it could manufacture *identical* products at issue in the exclusion requests within the 8-week timeframe required by the Rule. *Id.,* ERID 11927-005; 11928-05; ERID 11927-029 – 035; 11928-029 – 035. Maverick misrepresented that it manufactures boronized OCTG with metallurgical qualities *identical* to EndurAlloy (including *inter alia*, claims of boron content between 0.097%-0.102%, and with characteristics copied from MLM's exclusion requests so that Maverick could misrepresent that it makes a product identical

to EndurAlloy[7]). Maverick also made a false claim in asserting that "the requested product [i.e., EndurAlloy] is a low end or standard product that can be manufactured by Maverick and other producers in the U.S." In reality, as detailed herein, Maverick significantly misrepresented to the Department that it manufactures—or could manufacture—boronized J-55 tubing to the exact dimensional, chemical, and mechanical specifications of EndurAlloy as cited in the MLM's exclusion requests.

Maverick misrepresented that "the requested merchandise," *i.e.*, Enduralloy, "is considered a standard product and is readily available in the requested quality and quantity from several domestic steel producers." *Id.*

Maverick further misrepresented that "Maverick manufactures OCTG to the dimensional, chemical, and mechanical specifications cited in the Exclusion Request."[8]

### C.   MLM Rebuts Maverick's Objection Claims.

MLM timely filed rebuttals to each of Maverick's objections, asserting *inter alia* that "Maverick either fails to understand the nature of EndurAlloy or has knowingly made materially false statements to BIS in its objection filing. *See e.g.*, 18 U.S.C. § 1001(a)(2)." ERID 11927-043;

---

[7] Notably, Maverick failed to *correctly* copy the EndurAlloy metallurgical qualities listed in MLM's exclusion requests. Indeed, the Objector failed to include an arsenic specification in the "other chemical" field of the objection form. ERID 11927-031; 11928-031.

[8] We note that, in certain cases, steel companies' objections to Section 232 exclusion requests have led to claims of anticompetitive conduct. *See e.g. JSW Steel Inc. v. Nucor Corp.*, 2022 U.S. Dist LEXIS 28648 (S.D. Tex., February 17, 2022). Moreover, as noted in MLM's Rebuttal Filing:

… a recent decision in the U.S. District Court of the Southern District of Texas where a federal jury returned a $31 million civil verdict against Spanish pipe manufacturer Ulma Piping for undercutting the business of two American pipe makers by falsely advertising that its OCTG products were strengthened by heat treatment (*i.e.*, ASTM A105 or ASTM A105N) when they were not actually so treated. *See e.g., Boltex Manufacturing Co. LP et al. v. Ulma Forja S. Coop, a/k/a Ulma Piping*, case no. 4:17-cv-01400 (Jury Verdict, ECF 296). This serves to underscore that a representation that a steel pipe has been treated to achieve certain characteristics is an important and serious representation, not to be taken lightly.

*See* ERID 11927-043 at fn3; 11928-043 at fn3 (emphasis added).

11928-043. MLM stressed that no other North American facility aside from ETI's facilities in Alberta, Canada, is capable of altering Range 2 (*i.e.,* 28 to 32 foot lengths) J-55 tubing by means of a thermo-chemical diffusion boron alloying procedure. ERID 11927-044; 11928-044. MLM stated with certainty that Maverick has no such facilities and advertises no resultant products on its website. ERID 11927-048; 11928-048. Maverick made no claims to the contrary.

MLM explained that a surface engineering thermo-chemical diffusion (*i.e.,* thermal-diffusion) process—sometimes referred to as "diffusion alloying" or "pack cementation process"—is based on the chemical vapor deposition ("CVD") principles. MLM explained that EndurAlloy metallurgical characteristics are only possible by means of this process.

In support of its claims that EndurAlloy is unique and far superior product as compared to standard J-55 tubing, MLM offered, at Exhibit A, a detailed case study that compared the performance of EndurAlloy to regular steel pipe as well as internal plastic coated ("IPC") pipe performance. *See e.g.,* ERID 11927-049 – 056; 11928-049 – 056. Additionally, MLM presented at Exhibit B, a summary of the testing results of a third party laboratory tasked with testing the abrasion resistance of EndurAlloy against regular steel pipe. As indicated, EndurAlloy increases run time, decreases downtime and lasts three to ten times longer than regular production tubing. In even the most severely corrosive high pressure- high temperature water steam with salts, CO and CO2, H2S, acidic gases and water injection environments, EndurAlloy products stand up and perform to keep production moving forward. *See e.g.,* ERID 11927-057 – 063; 11928-057 – 063.

MLM's rebuttal filings also explained *inter alia* that (i) Maverick's very non-specific coated OCTG tubing is not comparable to EndurAlloy, ERID 11927-045 – 046; 11928-045 – 046; (ii) Maverick does not currently offer for sale any product similar to EndurAlloy, , ERID 11927-046 – 047; 11928-046 – 047; and (iii) Maverick could not produce product similar to EndurAlloy

without significant research and development and investment in new facilities, and certainly not within the claimed timeframe, ERID 11927-047 – 048; 11928-047 – 048.

Additionally, MLM noted in its rebuttal that Maverick filed objections in the BIS proceeding involving MLM's Exclusion Request 11927 (involving products of subheading 7306.29.8110, HTSUS), but Maverick styled its Objection Letter in Support (dated September 13, 2019), *see* ERID 11927-036 *et seq.*, in a manner addressed only to subheading 7304.29.6115—a tariff provision not at issue in MLM's Exclusion Request 11927. Indeed, as depicted in the screenshot below, Maverick never purported to file an objection to Exclusion Request 11927:

> **Re:** **Objection to Requests for Exclusion from Remedies Resulting from the Section 232 National Security Investigation of Imports of Steel filed by Maple Leaf Marketing, Inc. - 7304.29.6115.**
>
> Dear Mr. Botwin:
>
> Maverick Tube Corporation ("Maverick") hereby responds to the requests for exclusion filed by Maple Leaf Maple Leaf Marketing, Inc. ("Maple Leaf") on August 2nd, 2019 and made publicly available on September 15th, 2019. We submit Maverick' timely objection to the granting of an exclusion in requests 11918, 11924 and 11926.

ERID 11927-036 (emphasis added). Thus, Maverick's Objection Letter does not even purport to address the products at issue in MLM's exclusion request 11927.

Given all of the misrepresentations in Maverick's Objection Forms and Letters, MLM submitted to BIS that "to substantiate its objection, Maverick should be required to submit to BIS evidence of its production of a product having the characteristics and properties of EndurAlloy." ERID 11927-045; 11928-045.

### D.   Maverick Declines to Respond to MLM's Rebuttal Letter and Supporting Exhibits.

Notably—perhaps in an effort to avoid further violations of 18 U.S.C. § 1001—Maverick declined to file a surrebuttal and abandoned the entire objection proceeding after MLM's rebuttal

filing, never identifying the information MLM suggested BIS should require Maverick to submit. Importantly, in declining to even attempt to support is (baseless) objection claims, Maverick failed to identify any Maverick facility which could produce 28-32 foot lengths of boronized J-55 tubes.

**E.    BIS Distinguishes Between Methods of Production in Determining MLM's Seamless and ERW Tubing Exclusion Requests, Granting Exclusions for Seamless J-55 Tubing But Denying Exclusions for ERW J-55 Tubing Despite There Being No Difference Imparted on the EndurAlloy End-Product By Virtue of the J-55 Tubing's Status as ERW or Seamless.**

On June 4, 2020, BIS issued Decision Documents in Exclusion Request Nos. 11918, 11924, and 11926, determining to <u>grant MLM's exclusion requests for **seamless** EndurAlloy tubing</u>, stating that "the product referenced in the above-captioned exclusion request is not produced in the U.S. in a sufficient and reasonably available amount or of a satisfactory quality, and recommends granting the request for an exclusion." *See* BIS Decision Memorandum, Exclusion Request Nos. 11918, 11924, 11926 (June 4, 2020), Compl. Ex. B (ECF 5-1). The granted exclusions relate to seamless EndurAlloy tubing products of subheading 7304, HTSUS.

On June 7, 2020, BIS issued Decision Documents regarding Exclusion Request Nos. 11927, and 11928, determining to <u>deny MLM's exclusion requests for **electro-resistant welded** ("ERW") EndurAlloy tubing</u>, stating that "the product referenced in the above-captioned exclusion request is produced in the U.S. in a sufficient and reasonably available amount and of a satisfactory quality, and recommends denying the request for an exclusion." *See* BIS Denial Decision Memorandum, Exclusion Request No. 11918 (June 4, 2020), Compl. Ex. A (ECF 5-1). The denied exclusions relate to ERW EndurAlloy tubing products of subheading 7306, HTSUS.

**F.    MLM Files Action Alleging *Inter Alia* that the Denial Decisions Must Be "Set Aside" as Unlawful Under the APA.**

On June 24, 2020, MLM filed a Summons and Complaint in this action (ECF Nos. 1, 5), alleging *inter alia* that the denial of MLM's ERW tubing exclusion requests is arbitrary and

capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of procedures required by law. *See* Compl. at Count II (ECF 5).

      **G.**      **The Court Grants the Government's Consent Motion Ordering Voluntary Remand of Count II of Plaintiff's Complaint to BIS For Reconsideration of Denial Decisions.**

On June 22, 2021, the Court Ordered the Government to file its response to Count II of Plaintiff's Complaint by July 13, 2021 (ECF 29). However, "when an 'agency recognizes deficiencies in its decisions, explanations, or procedures … it may ask the court to remand the case back to the agency so that it may correct the deficiency.'" *NLMK Pa., LLC v. United States*, No. 21-00507, 2022 Ct. Intl. Trade LEXIS 6, at *4 (Ct. Int'l Trade Feb. 1, 2022) (citing 3 Charles H. Koch, Jr., Administrative Law and Practice § 8:31(d) (3d ed. 2010); *see also SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001)). Having likely recognized significant deficiencies in the record (that still persist following remand, *infra*), the Government filed a consent motion to remand Count II of MLM's Complaint so that the Department could "reconsider the 2 exclusion requests at issue, and to provide additional explanation for its decisions." *See* Def.'s Consent Mot. Voluntary Remand (ECF 33), at 2.

      **H.**      **On Remand, the Department Upholds its Original Denial Determinations.**

On October 18, 2021, the Government filed a letter styled "Final Results on Court remand Order in *Maple Leaf Marketing, Inc. v. United States*, Court No. 20-00125." *See* ECF 38. The filing included the remand results, which sustained BIS' original denial determinations with little to no additional details revealed, and in a manner that created significant additional legal issues caused by the inherently arbitrary and capricious nature of the Department's exclusion review proceedings.

## ANALYSIS

### I.    Standard of Review.

MLM's Count II seeks APA relief pursuant to the Court's residual jurisdiction, 28 U.S.C. § 1581(i). In all § 1581(i) actions, "[t]he Court of International Trade shall review the matter as provided in section 706 of title 5." 28 U.S.C. § 2640(e). In other words, § 1581(i) actions are reviewed "under the same standards as provided under section 706 of the [APA]." *JSW Steel,* 466 F. Supp. at 1327 (citing 28 U.S.C. § 2640(e)). In turn, the APA provides: that a "reviewing court shall—

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> > (1) compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > (2) hold unlawful and set aside agency action, findings and conclusions found to be—
> >
> > > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > >
> > > (B) contrary to constitutional right, power, privilege, or immunity;
> > >
> > > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > >
> > > (D) without observance of procedure required by law;
> > >
> > > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or
> > >
> > > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 ("Scope of Review"). Thus, under the APA, the Court will "set aside" challenged final agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

According to the United States Supreme Court, an agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of US., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cited by *JSW Steel*, 466 F. Supp. 3d at 1327); *see also*, *Alabama Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

While the Court is not to "substitute its judgment for that of the agency," its roles is "an important one" designed to "ensur[e] that agencies have engaged in reasoned decision-making." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). The Court "must assess … whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*. (quotations and citations omitted). "That task involves examining the reasons for the agency decisions - or, as the case may be, the absence of such reasons." *Id*.

Importantly, there can be no meaningful judicial review unless the agency has "articulated the reasons for [its] decision." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002). As the Supreme Court explained in *Motor Vehicle Mfrs. Ass'n*, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

> Commerce will have to explain its determination, specifically, how the record supports its determination in light of the relevant law and considering what fairly detracts from its conclusion. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). When it does so, if the court finds Commerce's explanation lacking in light of the record, the court can remand the redetermination.See *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44..

*NLMK Pa., LLC v. United States*, No. 21-00507, 2022 Ct. Intl. Trade LEXIS 6, at *7 (Ct. Int'l Trade Feb. 1, 2022) (cleaned up).

As explained herein, the Department failed to publish the "whole record," failed to properly articulate reasons for its denial decisions, and certainly lacked a "rational connection" between its denial decisions and the record evidence before it.

## II. This Action Must be Remanded With Instructions for BIS to Supplement the Record With Information Regarding *Ex Parte* Communications Relied Upon by the Agency in Making its Denial Determinations.

BIS' remand determinations sustaining its original denial decisions relies on the agency's determination that a domestic producer, Maverick Tube Corporation ("Maverick"), was capable of producing, within 8 weeks, the identical product in question in a sufficient quantity and quality. And despite Maverick explicitly and repeatedly disclaiming that it could produce a substitute product with a "similar form, fit, function, and performance" to EndurAlloy, ERID 11927-029; 11928-029—a position that ITA was well aware of[9]—the remand determination indicates that the Department *sua sponte* raised questions about whether Maverick could produce a product comparable to EndurAlloy. In this way, the Department analyzed the objection on bases the objector did not advance itself. The Department lacks the power to change Maverick's position as to whether it can manufacture a substitute product. And yet, BIS did exactly this by analyzing a substitutability claim on behalf of Maverick, and then, relying solely on *ex parte* communications

---

[9] ITA confirmed that Maverick disclaimed substitutability as a basis for its objections and instead advanced its objections on a single basis only—*i.e.,* alleging (dishonestly) that it could manufacture an *identical* product. ERID 11927-05; 11928-05.

with an unidentified person (or persons) claimed to be a Subject Matter Expert ("SME"), BIS accepted ITA's recommendation, articulated (poorly) by the unidentified SME, to deny MLM's exclusion requests.

As the SME is nowhere identified by BIS or ITA, and the contents of the *ex parte* communication do not appear on the record the Government filed in this action, this Court is unable to determine whether BIS' denial determinations are supported by evidence in the record, or are in violation of the APA. The Court must therefore remand this matter again so that *inter alia* (i) the SME can be identified, along with materials to support ITA's SME designation for the individual (*e.g.,* is the supposed SME actually an "expert" on matters involving themo-chemical diffusion boronizing of OCTG products, or taking a step back, does he/she even know what themo-chemical diffusion boronizing of OCTG describes or how the end-use of the altered OCTG is enhanced in condition by virtue of this process?[10]); (ii) a description of the SME's methodology and materials reviewed can be provided (under seal) on this Court's docket; and (iii) the contents of the materials reviewed by the SME and the *ex parte* communications ITA and/or BIS and/or others had with the SME can be placed on the record.

The BIS Remand Determination filed with the Court on October 18, 2021 (ECF 38), in a section entitled "Subject Matter Expert Evaluation of Facts" states (emphasis added):

> Analysis of the Record: Maple Leaf seeks exclusion for its Electric Resistance Welded (ERW) Range 2 API Spec. 5CT J-55 grade steel tubing. **The request includes an arsenic specification. Maverick states it can manufacture an identical product but does not specifically mention arsenic or API 5CT in the objection offering**. ITA notes that Maverick includes a statement that, "Maverick manufactures OCTG to the dimensional, chemical, and mechanical specifications cited in the Exclusion Request." As such, ITA has determined that the specific statement made by the objector satisfies and meets the specifications listed in the exclusion request. **The request also specifies a thermo-chemical diffusion boron**

---

[10] From the few lines in the record discussing the SME's conclusion, it does not appear that BIS, ITA, or the SME undertook a complete and thorough review of MLM's exclusion requests, its rebuttals, or the exhibits accompanying its requests/rebuttals.

**alloying procedure. Maverick does not specifically mention this procedure in the objection offering.** As a result, SME analysis was requested to evaluate the suitability of Maverick's offering. The SME determined Maple Leaf's claim that the requested specifications can only be met using the boron surface hardening methods employed by its current manufacturer is incorrect. Based on technical factors, the objection offering is deemed a suitable substitute. Therefore, Maverick meets the quality criterion.

ERID 11927-05; 11928-05.

BIS' remand determination contains several contradictory statements at odds with its ultimate conclusion that Maverick produced a suitable substitute to the subject EndurAlloy. First, the remand notes that MLM sought an exclusion for API 5CT J-55 steel grade tubing, that the tubing has undergone a thermos-chemical boron alloying procedure, and that EndurAlloy's metallurgical content includes an arsenic specification. Maverick's offering neither mentions the important API 5CT standard, nor the thermo-chemical boron alloying procedure, nor any specific arsenic level. Instead, Maverick falsely claims EndurAlloy "is a low end or standard product that can be manufactured by Maverick and other welded producers in the U.S." This claim is so obviously false[11] that BIS should have doubted the veracity of any Maverick claims not supported by specific evidence.

Second, and more critically, the remand determination notes that MLM's exclusion request identified a "thermo-chemical diffusion boron alloying procedure" which Maverick does not mention. This referenced procedure the Enduralloy boronizing process, which alloys and hardens the inner diameter of the tubing and imparts its critical characteristics and value added. The

---

[11] In its Exclusion Request Letter, MLM notes that ETI processes J-55 tubing into EndurAlloy by "loading a 'chemical pack' into the inner diameter of ordinary J-55 tubing substrate," which is then subjected to very high temperatures that cause "boron and other chemicals [to be] thermally-deposited within the J 55 tube such that a microns-thin alloyed surface structure of boron forms on the inner diameter of the J-55 carbon steel tubing." ERID 11927-022 – 023; 11928-022 – 023. MLM further noted that "ETI uses a special composition of powders," *id.* at n4, in its "chemical pack." As a result of its proprietary blend of chemical powders, it would be impossible for another company to match EndurAlloy's metallurgical composition as presented in the Exclusion Request Form, even assuming *arguendo*, that they had the production machines necessary to perform a thermo-chemical diffusion boron alloying procedure on the inner diameter of Range 2 J-55 tubing.

absence of any reference to the boronizing process in Maverick's claim to make an identical product strongly undercuts that claim. MLM did not request an exclusion for J-55 steel tubing generally, only such tubing which had been subjected to the boronizing process. BIS' reliance on Maverick's obviously insufficient statements represents an abuse of discretion, and arbitrary and capricious action, in violation of the APA.

Critically, neither this Court, nor the parties, can discern the correctness of BIS' remand determination. The resolution of the above-noted incongruities appears to have been "turfed out" to an unidentified "Subject Matter Expert" (SME) with whom BIS's decision-makers communicated *ex parte*. These *ex parte* communications were not included in the record filed with the Court (ECF 42), but clearly were relied upon by BIS in making its decision Rather, the remand determination contains a cursory statement that "yes" the SME evaluated unspecified facts, and arbitrarily concluded that MLM's exclusion requests should be denied. There are so many flaws with the foregoing that it is difficult to know where to begin; an attempt is made below.

Although the Commerce Department certified the agency record as complete, it is clear that the record is not complete, and this case must be remanded to BIS with instructions to complete the record.

### A.    Remand is Required to *Inter Alia* Identify the SME, Evaluate His or Her Qualifications, and Identify What Facts Were Reviewed.

BIS abdicated its decision on remand to the SME and now, as the record currently stands, neither Plaintiff nor the Court are able to judge the qualifications of the SME, nor the basis or correctness of his/her conclusion, which ITA and BIS arbitrarily and capriciously adopted as their own despite the lack of support or details in the record.

This Court is directed to decide this action using the standard of review specified in the APA. 5 U.S.C. §§ 706(1), (2)(A); *JSW Steel*, 466 F. Supp. at 1327 (citing 28 U.S.C. § 2640(e)).

This requires, however, that the "whole record" be placed before the Court for review, which is not the case here.

As a starting point, neither the Plaintiff nor the Court know anything about the SME. We do not know important information about the SME, including *inter alia*, (i) whether the SME is internal to BIS or external; (ii) whether the SME is qualified; (iii) whether the SME is impartial; (iv) whether the SME reviewed all pertinent information submitted by the requestor and objector; (v) whether the SME reviewed information additional to that submitted by the requestor and objector; (vi) whether the SME was appropriately enlisted by ITA to contribute to the review; (vii) why the SME identified only a few of the many material anomalies[12] between EndurAlloy and the unidentified Maverick product ITA improperly considered as a substitute to EndurAlloy; and (viii) why the SME determined that the incomplete listing of anomalies identified in the Remand Decisions (*e.g.,* arsenic content, meeting API 5CT J-55 specifications, or the role of the chemical diffusion alloying procedure) are even relevant when Maverick repeatedly disclaimed substitutability as a basis for its objections.

More fundamentally, there is no way to tell from this record on what basis the SME was enlisted. According to ITA:

> An SME's evaluation of facts is typically sought when submitted documentation indicates: the objector offers a substitute product, the specifications differ in an objector's offering from the request, a processing method differs between the request and objection, or any other relevant product-specific issues. ITA takes an SME's evaluation of facts into consideration when making a recommendation; however, an SME's evaluation of facts is not the only determining factor and is not necessarily dispositive.

---

[12] Other obvious differences between EndurAlloy and the unidentified Maverick product ITA improperly considered as a substitute to EndurAlloy include but are not limited to: (i) performance advantages of EndurAlloy (*e.g.,* anti-corrosive characteristics, longevity) ERID 11927-024; 11928-024; (ii) significant cost differences of EndurAlloy (costing up to 4 times as much as non-EndurAlloy J-55 tubing) ERID 11927-045; 11928-045; (iii) consistent API characteristics of EndurAlloy both pre- and post-boronizing by ETI. ERID 11927-024; 11928-024.

> **ITA will base its recommendation on an evaluation of all relevant submitted certified documentation, including relevant CBI, and, when appropriate, an evaluation of facts by an SME. Only information provided in the submitted documentation will be used in the evaluation of exclusion requests and objections. ITA will not include any ex-parte communications in its evaluation.**

ERID 11927-007; 11928-007 (emphasis in original). In the SME's "analysis of the record," an unidentified author lists some (of the many) incongruities between EndurAlloy and an unidentified product only referred to as "Maverick's offering," and concludes that "SME analysis was requested to evaluate the suitability of Maverick's offering." ERID 11927-005; 11928-005. Questions abound regarding the nature of "Maverick's offering" since Maverick offered no substitute product in its objection. Therefore, it was an abuse of discretion, arbitrary and capricious for the SME to compare EndurAlloy against an unspecified "Maverick offering" when Maverick repeatedly disclaimed substitutability as a basis for its objection, and never identified an "offering" for the SME—let alone Plaintiff or this Court—to analyze against EndurAlloy.

As noted in *Portland Audobon Soc. V. Endangered Species Comm.,* 984 F.2d 1534, 1548 (9th Cir. 1993):

> Section 706 of the APA provides that judicial review of agency action shall be based on "the whole record." "The whole record" includes everything that was before the agency pertaining to the merits of its decision. *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555-56 (9th Cir. 1989). An incomplete record must be viewed as a "fictional account of the actual decisionmaking process." *Home Box Office, Inc. v. Federal Communications Comm'n*, 567 F.2d 9, 54 (D.C. Cir. 1977). When it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate. *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982).

Under these circumstances, remand of BIS' Remand Determination, with instructions for BIS to supplement the record, is appropriate. *See e.g., PATCO v. FLRA I*, 672 F.2d 109, 112-13 (D.C. Cir. 1983) (record must be supplemented with undisclosed *ex parte* communications); *Bethlehem Steel Corp. v. Environmental Protection Agency*, 638 F.2d 994, 999-1000 (7th Cir. 1980)

(supplementation should be allowed where documents related to improper *ex parte* communications). As further noted by the Ninth Circuit in *Portland Audobon Soc.*:

> If the record is not complete, then the requirement that the agency decision be supported by "the record" becomes almost meaningless. See *HBO v. FCC,* 567 F.2d at 54. Indeed, where the so-called "record" looks complete on its face and appears to support the decision of the agency but there is a subsequent showing of impropriety in the process, that impropriety creates an appearance of irregularity which the agency must then show to be harmless. See *Buschmann v. Schweiker*, 676 F.2d 352, 358 (9th Cir. 1982); *Marathon Oil Co. v. Environmental Protection Agency*, 564 F.2d 1253, 1271-72 (9th Cir. 1977).

984 F.2d at 1549. BIS' failure to place the apparently dispositive *ex parte* SME communications on the record here does not necessarily void its decision, but renders it voidable if the shortcoming is not adequately corrected. *See e.g.*, *Prof. Air Traffic Controllers Ass'n. v. FLRA*, 685 F.2d 547 (D.C. Cir 1982); *Salem Hosp. Corp. v. NLRB*, 808 F.3d 59 (D.C. Cir. 2015).

The failure to include in a record *ex parte* communication which communicate new and material information to the deciding official—which was apparently the case here—constitutes a due process violation as well. *Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999); *Goldenberg v. Fed. Bureau of Prisons*, 2021 U.S. App. LEXIS 24266, at *7-8 (Fed. Cir. 2021). However, the record as presently constituted is clearly insufficient for judicial review:

> (W)here, as here, an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly, *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 415, 419-420 (91 S. Ct. 814); See K. Davis, *Administrative Law of the Seventies* § 11.00 at 317 (1976), but must treat the agency's justifications as a fictional account of the actual decisionmaking process and must perforce find its actions arbitrary. See *Ruppert v. Washington*, 366 F. Supp. 686, 690 (D.D.C.1973), Aff'd by order, (177 U.S.App.D.C. 270, 543 F.2d 417) D.C. Cir. No. 73-1985 (Oct. 26, 1976), 185 U.S.App.D.C. at 187-188, 567 F.2d at 54-55.

*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54-55 (D.C. Cir. 1977) (quoted in *United States Lines v. FMC,* 584 F.2d 519, 541-42 (D.C. Cir. 1978)). Indeed, we have no idea whether the SME

consulted by BIS is qualified or biased (*e.g.,* as a representative of a domestic pipe and tube manufacturer or industry trade association), and we have no idea why the SME was enlisted (considering Maverick disclaimed substitutability) or what the SME reviewed.

The need for a clear and complete record is particularly important in cases such as this which involve "proceedings which resolve "conflicting private claims to a valuable privilege." *Sangamon Valley Television Corp. v. United States, supra*, 269 F.2d 221, 224 (D.C. Cir. 1959).

This Court very recently stressed that when a Court is called upon to conduct record review, it is essential that the record be "complete." *See e.g., Norca Indus. Co., LLC v. United States,* 2022 Ct. Intl. Trade LEXIS 18, at *10 (Ct. Int'l Tr. March 11, 2022) (holding that "it is essential for the parties to have the opportunity to make presentations … based on complete information[.]"

Indeed, this is not the first time that BIS has used *ex parte* communications in troubling, and possibly improper ways, in proceedings regarding the filing and consideration of Section 232 exclusion requests and objections. Indeed, a Memorandum dated October 28, 2019, from the Commerce Department's Inspector General noted that:

> Department officials and interested parties have discussed information about pending exclusion requests that was not included in the official record. Following some of these off-record communications, Department officials took subsequent action consistent with such communications, giving the appearance that the Section 232 exclusion request review process is not transparent and that decisions are not rendered based on evidence contained in the record.

Office of Inspector General, U.S. Dep't Commerce: *Management Alert: Certain Communications by Department Officials Suggest Improper Influence in the Section 232 Exclusion Request Review Process* (October 28, 2019) (Final Memorandum No. OIG-20-003-M) ("OIG Section 232 Memo"). The Inspector General warned then-Commerce Secretary Wilbur Ross, that procedural irregularities "give[] the appearance that Department officials may not be impartial or transparent and are potentially making decisions based on evidence not contained in the official record for

specific exclusion requests." *Id.* The Inspector General's recommendations included "documenting all discussions with interested parties, and directing all emails concerning specific exclusion requests to BIS' official organizational email addresses, to ensure that the correspondence becomes part of the official record." *Id.*

For its part, this Court has previously noted the problem of improper *ex parte* communications by BIS officials in the Section 232 exclusion request context. Numerous cases have prompted remands of challenged exclusion decisions, including voluntary remands requested by BIS itself. *See Maple Leaf Marketing, Inc. v. United States*, No. 20-00125, Consent Motion to Remand (July 20, 2021) (ECF 33); Order Granting Consent Motion to Remand (July 20, 2021) (ECF 34); Remand Results (October 18, 2021) (ECF 38); *see also, Borusan-Mannesman Steel Pipe Co. v. United States*, No. 20-00012, 2020 Ct. Intl. Trade LEXIS 95 (Ct. Int'l Trade June 25, 2020); *NLMK Pa., LLC v. United States*, No. 21-00507, 2022 Ct. Intl. Trade LEXIS 6 (Ct. Int'l Trade Feb. 1, 2022); *JSW Steel,* 466 F. Supp. at 1329-30. Thus, for instance, in *JSW Steel,* this Court noted:

> … Commerce must certify steps taken to identify and correct deficiencies in the administrative record, including steps taken to ascertain if any of the *ex parte* meetings were directly or indirectly considered by Commerce in its determinations and, if not, how it determined that the discussions at these meetings with the objectors were not directly or indirectly considered in its decisions. Should Commerce determine, as a result of this process, that there are further materials, such as any notes, memoranda, or other documents pertaining to the *ex parte* meetings, required to supplement the record, it shall so supplement the record. If it determines that no further supplementation is required, it shall so state along with its explanation.

466 F. Supp. at 1329-30 (footnotes omitted).

Here, the missing *ex parte* communications were not peripheral but were central to the Remand Determination. We have no idea how BIS came to resolve conflicts in favor of Maverick, which declined to even identify a "product offering" in its Objection and declined to file a

surrebuttal. We have no idea how BIS or the SME determined Maverick's unidentified "offering" was substitutable for EndurAlloy, and no idea concerning the impartiality and qualifications of whatever SME the agency improperly delegated the decision to. Remand for supplementation of the "whole record" is clearly in order.

### III.    There is No Justifiable Rationale For Denying Plaintiff's Exclusion Requests.

BIS' remand determination denying MLM's two exclusion requests violate the APA in several distinct ways addressed herein. As the Court held in *NLMK Pa., LLC v. United States*, No. 21-00507, 2022 Ct. Intl. Trade LEXIS 6, at *6 (Ct. Int'l Trade Feb. 1, 2022):

> Once Commerce makes its determination, this court reviews whether Commerce's decision is in accordance with law and supported by substantial evidence based on the record. 5. U.S.C. § 706(2)(A) (2018); *see* 28 U.S.C. § 2640(e) (2018*); see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985). If the determination is contrary to law or is not supported by the record, whether because it is tainted by *ex parte* communications, fails to account for evidence that detracts from the conclusion, is not reasonably supported by the record evidence, or any other reason, the appropriate action for the court is to remand the determination to Commerce. *See id*.; *see also Regal*, 324 U.S. at 13.

Accordingly, as discussed herein, the denial determinations must be remanded yet again.

### A.    Maverick's Objection Filing Includes Clearly Contradictory Claims That are Irreconcilable and Cannot be Resolved on Remand.

Maverick's objections against MLM's exclusion requests are internally contradictory and cannot be reconciled against the Department's determination to deny MLM's exclusion requests.

#### 1.    Maverick Falsely Claimed it Can Manufacture a Product *Identical* to EndurAlloy Within 8 Weeks and Merely Copied the Metallurgical Profile of EndurAlloy in its Objection.

After misrepresenting that EndurAlloy "is a low end or standard product that can be manufactured by Maverick and other welded producers in the U.S."— an objectively false statement—Maverick answered "**Yes**" to the following question:

> Is the product type identified in the Exclusion Request currently manufactured by your organization in the United States, or can it immediately be made (within 8 weeks) by your organization, in a company-owned plant in the United States? If "Yes" identify the locations(s) of your production facilities in the United States.

ERID 11927-029; 11928-029. Maverick then misrepresented that a product *identical* to EndurAlloy could be manufactured at Maverick's facilities in Blytheville, AR.

Maverick admitted that it "does not currently manufacture" boronized steel tubing at the identified facilities, but claimed that within 8 weeks: "Maverick has the capability to manufacture and supply the identified steel product. Capacity utilization levels for our plants is business proprietary information and can be provided upon request." *Id.* (emphasis added).

Maverick thus claimed that it can itself produce an *identical* product to EndurAlloy. This entirely bogus claim is further confirmed by Maverick's sloppy attempt to copy the exact metallurgical chemical composition claims listed in MLM's exclusion requests for EndurAlloy. This copying is especially absurd because Maverick could not even trouble itself to *accurately* copy the *entire* EndurAlloy metallurgical profile. Instead, Maverick overlooked the blank text box where a requestor can elect to add chemicals that are not listed in BIS' default listings of elements sought to be identified. Indeed, the entire metallurgical profile of MLM's EndurAlloy was copied, number-for-number and decimal-for-decimal, in Maverick's objection filing, but the person tasked with this job lacked the thoroughness necessary to recognize that MLM had included chemicals not specifically sought by BIS; and accordingly, Maverick failed to include an arsenic specification. ERID 11927-030 – 031; 11928-030 – 031.

This highly questionable copying of MLM's listed information for EndurAlloy continued into various other sections of the exclusion request/objection forms inquiring about product tolerances, specifications, and strength. As before, Maverick copied all of MLM's claims for EndurAlloy in its objection filing. ERID 11927-030 – 33; 11928-030 – 33.

> **2.**      **The Department Erroneously Evaluated Maverick's Objection as if the Objector Had Claimed Substitutability as a Basis for its Objection.**

There can be no doubt that Maverick's objection was made because it claimed (untruthfully) that it could manufacture an identical product within 8 weeks. To be sure, Maverick answered "**No**" to the following question:

> Does this organization currently manufacture, or can immediately manufacture (within 8 weeks), in a company-owned plant located in the United States a substitute product for the identified product that has similar form, fit, function, and performance? If "Yes" identify the location(s) of your production facilities in the United States, current plant capacity and utilization.

ERID 11927-029; 11928-029 (emphasis added). Stated another way, **Maverick does not currently produce, and cannot within 8 weeks, produce a "substitute product"** that has "similar form, fit, function, and performance" to EndurAlloy.

Maverick confirmed in its response to other questions that it was not objecting on the basis of substitutability, responding on the BIS Form as follows:

> Q: This organization does not currently manufacture the identified product, but can make a substitute product that has similar form, fit, function, and performance within the following time period at the following facilities:
>
> A: **N/A. Maverick has capability to manufacture and supply the identified steel product**. Capacity and utilization levels for our plants is business proprietary information and can be provided upon request.

*Id.* (emphasis added).

Thus, the foregoing makes clear that the basis of Maverick's objection was ***not*** that a substitute product is comparable to EndurAlloy and is sufficiently available in the United States, but rather, that Maverick makes an identical product with the exact unique metallurgical profile of EndurAlloy. This is an outlandish proposal by Maverick considering the processing necessary to

achieve the EndurAlloy characteristics.[13] The notion that an ordinary J-55 tubing (whether ERW or seamless) would have boron levels at or near those claimed by Maverick is easily disprovable. Even if, *arguendo*, Maverick had a facility with the capability to perform a thermo-chemical diffusion boron alloying procedure on the ID of API 5CT J-55 tubing, let alone a facility large enough to perform this operation on a Range 2 (28 to 32 feet) length of tubing, Maverick's claim that it can make a product with a metallurgical profile identical to EndurAlloy is beyond improbable. The composition of ETI's cocktail of powder chemicals (*i.e.,* the "chemical pack") used in ETI's thermo-chemical diffusion boron alloying procedure is proprietary and the exact mixture could never be replicated to impart the metallurgy Maverick in the manner that Maverick so disingenuously claims.

On the record evidence before us, it is unfathomable to believe that BIS and the unidentified SME, both determined that Maverick presented credible claims in its Objection when it <u>so obviously copied, albeit incorrectly, MLM's metallurgical profile for EndurAlloy</u>.[14] The SME here even noted that Maverick was silent about its ability to produce a Range two J-55 tubing product to API 5CT that is boronized in a manner that *performs* similar to EndurAlloy.

Recall that MLM presented BIS with a case study comparing the performance of EndruAlloy to regular J-55 steel tubing. The study also compared EndurAlloy to a variety of coated OCTG products. *See* MLM Rebuttal ERID 11927-045; 11928-045; ERID 11927-049 – 056;

---

[13] Even if, *arguendo*, Maverick had a facility with the capability to subject a 28 to 32 foot length of J-55 steel tubing to a boronizing operation, the composition of the "chemical pack" used in ETI's EndurAlloy chemical vapor deposition processing is comprised of a proprietary cocktail of chemical powders. This alone disproves Maverick's claims that it can manufacture a product with an identical metallurgical profile—how the Department or the unidentified SME determined that Maverick presented credible claims in its objection is difficult to understand.

[14] It is troubling that ITA assigned an SME who failed to understand or appreciate that the metallurgical composition of EndurAlloy, if such chemical were present throughout an ordinary J-55 tube as Maverick appeared to claim it could produce, would make the resultant product brittle and worthless for OCTG applications.

11928-049 – 056.[15] The results of the study demonstrate the dissimilarity of EndurAlloy with standard J-55 tubing as it concerns function and performance.

Additionally, testing results from a third-party laboratory tasked with testing the abrasion resistance of EndurAlloy as compared against regular J-55 steel tubing was provided to BIS. *See Id.*at ERID 11927-045; 11928-045; ERID 11927-057 – 063; 11928-057 – 063. As indicated in these studies, EndurAlloy increases run time of OCTG operations, decreases downtime, and lasts three to ten times longer than regular J-55 tubing. *Id.* In even the most severely corrosive high pressure- high temperature water steam with salts, CO and $CO_2$, $H_2S$, acidic gases and water injection environments, EndurAlloy tubing products stand up and perform to keep production moving forward. *Id.* at ERID 11927-045; 11928-045.

### 3. On the Basis of Maverick's Contradictory and Factually Impossible Claims, The Department's Denial Decisions Cannot be Sustained.

The Department is unable to sustain its denial decisions because ITA's determination is entirely dependent on an obvious misunderstanding of the facts—*i.e.,* ITA denied MLM's two ERW exclusion requests because it concluded that Maverick is capable of making, within 8 weeks, a "substitute product" (*i.e.,* form, fit, function, and performance) that is comparable in form, fit, function, **and performance** to EndurAlloy. The problem for BIS is that Maverick explicitly certified that it does not, and could not, make a "substitute product" for EndurAlloy.

What then does the SME mean when he/she states that an evaluation of "the suitability of Maverick's offering" is necessary to determine whether it is comparable to EndurAlloy? It was inappropriate for the SME to evaluate Maverick's objection in this manner for several reasons.

---

[15] Despite MLM's supporting evidence accompanying its Rebuttal Letter in Exhibits A and B, and the numerous bases in its letter supporting its claim that Maverick's objection is baseless, the SME answered "no" to the question, "Does anything in the request, rebuttal, or surrebuttal, including attachments, provide evidence to contradict the objector's claims?" *See* ECF 38-1 at 5; ECF 38-2 at 5. Even a cursory review of MLM's Rebuttal demonstrates that this conclusion is grossly incorrect.

First and foremost, we know nothing about "Maverick's offering"—*i.e.,* what is the product the Department anticipates Maverick was supposedly offering as a substitute? We do know that Maverick miraculously claims it can produce something with metallurgical profile identical to that of EndurAlloy—we say "miraculously" because the EndurAlloy metallurgical profile can only be accomplished by a thermal chemical diffusion process of boronizing the inner diameter of J-55 tubing; and even if, *arguendo*, Maverick had a facility capable of thermo-chemical vapor deposition boronizing a Range 2 (28 to 32 foot length of J-55 steel tubing) to a boronzing operation, the composition of the "chemical pack" used in ETI's EndurAlloy chemical vapor deposition processing is comprised of a proprietary cocktail of chemical powders. This alone puts paid Maverick's claims that it can manufacture a product with an identical metallurgical profile— how the Department or the unidentified SME determined that Maverick presented credible claims in its objection is difficult to understand.

**B.    The Department Contradictorily Concluded that EndurAlloy Processed from Seamless Tubing is Not Sufficiently Available in the United States While EndurAlloy Processed from ERW Tubing is Not.**

The Department's denial decisions arbitrarily differentiate between EndurAlloy products altered from seamless and ERW tubing despite the fact that this characteristic is wholly irrelevant in the marketplace. The nature of the EndurAlloy product's status as comprised of a "seamless" or "ERW" tube is of no consequence to ETI, MLM, or the end-use customers in the United States. Indeed, a length of "seamless" J-55 tube of a given diameter, altered using ETI's vacuum thermal deposition boronizing process, is identical in all material respects (*e.g.,* performance, cost) to an ERW J-55 tube of the same length/diameter. Not a single physical or mechanical difference can be identified, and not a single difference was identified in the denial decisions.

The Department's decisions denying MLM's two requests concerning EndurAlloy Tubing altered from ERW J-55 tubing are arbitrary and capricious because the Department's conclusions that these products are sufficiently and reasonably available in the United States are not only unsupported but "run[] counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Indeed, at the time of BIS' original denial decisions, BIS had already granted three (3) of MLM's exclusion requests involving EndurAlloy altered from seamless tubing, holding that EndurAlloy altered from ordinary seamless J-55 tubing is not produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality. *See* Def.'s Answer, ECF 46 at ¶ 69. This was the correct conclusion. However, BIS somehow denied exclusion requests involving EndurAlloy altered from ordinary ERW J-55 tubing, concluding that an identical product is, or can be, produced domestically. ERID 11927-05; 11928-05. This is a preposterous, wholly unsupported, and unsupportable, position.

It does not appear that BIS appreciated or understood the nature of the product before it— which is not ERW or Seamless J-55 tubing, but rather the EndurAlloy product altered therefrom— and thus, BIS failed to appropriately consider Plaintiff's exclusion requests. This is inexcusable. Plaintiff submitted uncontroverted evidence that no domestic producer has the capability to produce a specially hardened boronized product that is subject to a thermal-deposition process whereby enhanced hardness is imparted without affecting the product's API specifications and qualifications. ERID 11927-044 – 046; 11928-044 – 046. Moreover, Plaintiff presented studies on the BIS record which directly compared standard J-55 tubing against EndurAlloy, and further compared various coated OCTG products against EndurAlloy. In each comparison, EndurAlloy

far outperforms the compared product. Neither BIS, ITA, nor the SME, appear to have considered these materials.

C. **The SME Erroneously Concluded that MLM's "Claim that the Requested Specifications Can Only Be Met Using the Boron Surface Hardening Methods Employed by its Current Manufacturer is Incorrect" Was Itself Incorrect, as Was the SME's Conclusion that "Based on Technical Factors, the Objection Offering is Deemed a Suitable Substitute."**

First and foremost, there was no "objection offering" submitted by Maverick. An evaluation of Maverick's objection reveals a promise to supply within 8 weeks a product with an identical metallurgical profile to EndurAlloy. As stated, *supra,* this is impossible.

The metallurgical specifications in MLM's exclusion requests can only be met by ETI. Even if, *arguendo*, a facility in the United States could boronize Range 2 J-55 tubing—and to be clear, at all times relevant to this proceeding, they could not—that facility could not, absent alchemy, produce steel tubing with the exact metallurgical profile of EndurAlloy. Unless a United States producer built a facility large enough to boronize Range 2 tubing, *and* unless ETI licenses its proprietary methods and proprietary "chemical packs" with a United States producer, no United States facility could ever produce tubing that could satisfy Maverick's claims.

Moreover, the notion that a "coated" steel tubing could ever be considered equivalent in performance to EndurAlloy is laughable, as is ITA's claim that MLM failed to offer information which would rebut any claims of Maverick to the contrary (*e.g.,* that EndurAlloy is a low end, standard product).[16] MLM strongly rebutted the suggestion that a coated product is comparable to

---

[16] To be clear, for all the reasons discussed above, Maverick did not claim to make a substitutable product. It loosely referenced the existence of OCTG coating occurring in the United States but fell far short of identifying anything that could resemble an "objection offering" worthy of consideration against EndurAlloy. Maverick repeatedly rejected the notion that it was arguing for substitutability and rejected that it was offering a coated product in its Objection Form. ERID 11927-039; 11928-039.

EndurAlloy and offered case studies in support. *See* MLM Rebuttal, ERID 11927-045; 11928-045;

ERID 11927-049 – 056; 11928-049 – 056.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff requests that this Court issue an order granting its

USCIT R. 56 Motion for Judgment on the Agency Record.

Respectfully submitted,

Neville Peterson LLP
*Counsel    for    Maple    Leaf*
*Marketing, Inc.*

/s/ Richard F. O'Neill
Richard F. O'Neill
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

/s/ John M. Peterson
John M. Peterson
Patrick B. Klein
55 Broadway, Ste. 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com
Dated: March 18, 2022                        pklein@npwny.com

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:    THE HONORABLE CLAIRE R. KELLY, JUDGE**
-------------------------------------------------------------------- X
MAPLE LEAF MARKETING, INC.                          :
                                                    :
             **Plaintiff,**                         :
                                                    :
             *v.*                                   :
                                                    :
THE UNITED STATES, JOSEPH R. BIDEN,                 :
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF           :
THE UNITED STATES; GINA M. RAIMONDO., IN           :      Case No. 20-00125
HER OFFICIAL CAPACITY AS SECRETARY, U.S.           :
DEPARTMENT OF COMMERCE; CHRIS                       :
MAGNUS, IN HIS OFFICIAL CAPACITY AS                :
ACTING COMMISSIONER, U.S. CUSTOMS AND              :
BORDER PROTECTION; KATHERINE C. TAI, IN            :
HER OFFICIAL CAPACITY AS U.S. TRADE                :
REPRESENTATIVE,                                     :
                                                    :
             **Defendants.**                        :
-------------------------------------------------------------------- X


## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Richard F. O'Neill, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 13,359 words.


Respectfully submitted,

/s/ Richard F. O'Neill
    Richard F. O'Neill

Dated: March 18, 2022